UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>    Defendant. | Civil Action No. 12-667 (CKK) |

MEMORANDUM OPINION
(March 28, 2013)

Plaintiff Electronic Privacy Information Center, or EPIC, filed suit against the Federal Bureau of Investigation, seeking injunctive relief under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. After EPIC submitted a request for documents relating to the use of cell-site simulator technology to the FBI, EPIC filed suit alleging that the FBI failed to comply with the statutory deadlines to respond to EPIC's FOIA request. Presently before the Court is the FBI's [14] Motion for an *Open America* Stay. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as whole, the Court finds the FBI has not demonstrated exceptional circumstances exist so as to warrant the fourteen-month stay of proceedings requested by the FBI. Accordingly, the FBI's motion is DENIED. This case shall proceed in accordance with the Order accompanying this Memorandum Opinion.

I. BACKGROUND

According to the Complaint, EPIC is a "public interest research organization incorporated

---

[1] Def.'s Mot., ECF No. [14]; Pl.'s Opp'n, ECF no. [15]; Def.'s Reply, ECF No. [16]; *Errata*, ECF No. [17].

as a not-for profit corporation in Washington, D.C.  EPIC[] conducts oversight of Government activities and policies and analyzes their impact on civil liberties and privacy interests."  Compl., ECF No. [1], ¶ 4.  On February 10, 2012, EPIC submitted a FOIA request to the FBI requesting agency records regarding cell-site simulator or "StingRay" technology,[2] which EPIC asserts is used by the FBI and other federal agencies to track and locate cellular telephones and other wireless devices.  *See id.* at ¶¶ 6-7.  The request specifically sought:

- "All documents concerning technical specifications of the StingRay device or other cell-site simulator technologies";

- "All documents concerning procedural requirements or guidelines for the use of StingRay device or other cell-site simulator technologies (e.g. configuration, data retention, data deletion)";

- "All contracts and statements of work that relate to StingRay device or other cellsite simulator technologies";

- "All memoranda regarding the legal basis for the use of StingRay device or other cell-site simulator technologies"; and

- "All Privacy Impact Assessments or Reports concerning the use or capabilities of StingRay device or other cell-site simulator technologies."

*Id.* at ¶ 20.  EPIC asked the FBI to expedite its response to the request, grant EPIC "News Media" fee status, and waive all duplication fees.  *Id.* at ¶¶ 21-23.

The FBI acknowledged receipt of EPIC's request on February 16, 2012 and assigned the request a tracking number.  Answer, ECF No. [11], ¶ 25.  On March 20, 2012, having received no further correspondence from the FBI regarding its request, EPIC filed an administrative appeal with the Office of Information Policy, part of the Department of Justice.  Compl. ¶¶ 30-31.  According to EPIC, the Department of Justice failed to respond to EPIC's appeal within the

---

[2] For purposes of this Memorandum Opinion, the Court uses the term "StingRay device" as shorthand for all relevant cell-site simulator technologies that might fall within the scope of EPIC's request.

twenty-day deadline set by the FOIA. *Id.* at ¶ 35. EPIC filed suit on April 26, 2012.

EPIC served the FBI and other relevant entities on May 7, 2012. Return of Service/Aff., ECF No. [5]. With EPIC's consent, the FBI sought a one-week extension of time in which to file its answer to the Complaint, which the Court granted. 6/8/12 Minute Order. The FBI filed its Answer on June 13, 2012. Answer, ECF No. [11]. The FBI's Answer indicates that on June 4, 2012, it granted EPIC a fee waiver, but denied expedited processing of EPIC's request for agency records. *Id.* at ¶ 27. The FBI also agreed to waive duplication fees because "Plaintiff's FOIA request will contribute to public understanding of the operations and activities of Government." *Id.* at ¶ 23.

Upon the filing of the FBI's Answer, the Court ordered the parties to confer and propose a schedule for proceeding in this matter. 6/14/12 Minute Order. In response, the parties filed a Joint Status Report, proposing vastly divergent schedules. EPIC proposed a schedule under which document production would be completed within two months from the date of the status report, with summary judgment briefing to be completed approximately three and one-half months after document production ended. Jt. Status Report, ECF No. [12], at 2. For its part, the FBI proposed completing the production of documents two years and five months after the submission of the status report, with completion of a *Vaughn* index taking an additional four months. *Id.* at 3-4. Under the FBI's proposed schedule, the parties' cross-motions for summary judgment would not be fully briefed until July 2015, over three years after the filing of the Complaint. In light of the extensive delay the FBI's proposed schedule would entail, the Court ordered the FBI to file a formal motion for a stay of proceedings.

The FBI subsequently filed the present motion, seeking a stay of proceedings in this case until October 31, 2014. In support of their motion, the FBI submitted a declaration from David

M. Hardy, the Section Chief of the Record/Information Dissemination Section, Records Management Division, of the FBI.  *See generally* First Hardy Decl., ECF No. [14-1]; Second Hardy Decl., ECF No. [16-1]; Third Hardy Decl., ECF No. [17-1].  The First Hardy Declaration provides additional insight into the status of EPIC's request.  Based on the breadth of the EPIC's request, the types of documents at issue, and the FBI's experience processing a similar request received in November 2011, the FBI determined that a traditional search of its Central Records System would likely be inadequate.  First Hardy Decl. ¶ 19.  Instead, the FBI decided "to conduct a more individualized inquiry (outside of the CRS) of certain FBI divisions and offices" reasonably likely to have potentially responsive records.[3]  *Id*.  However, the FBI did not immediately send a request for information to those offices.  *Id.*  Rather, the FBI elected to wait until it received the materials collected in response to the November 2011 request in order to determine if any of those documents were responsive to EPIC's request.  *Id.*  The FBI finally issued the request to relevant offices on May 23, 2012. First Hardy Decl. ¶ 20.  As of July 30, 2012, the FBI had gathered approximately 25,000 potentially responsive pages, although an initial assessment revealed a number of duplicate records within the 25,000 pages.  *Id.* at ¶¶ 4 n.2, 21.  The FBI estimates that approximately 25% of the responsive pages will be subject to classification/declassification review.  *Id.* at ¶ 4 n.3.

## II.  LEGAL STANDARD

The Freedom of Information Act provides, in relevant part, that upon receipt of a FOIA request, the responding agency must

---

[3] The Court makes no finding at this stage as to the adequacy of the FBI's search for responsive documents.  This information is provided merely as context for the Court's decision on the FBI's motion for a stay of proceedings.

> determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination.

5 U.S.C. § 552(a)(6)(A)(i).  Section 552(a)(6)(C)(i) provides that if a requesting party files suit following the responding agency's failure to comply with the statutory deadlines, "[i]f the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records."  In *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976), the D.C. Circuit found that an agency is entitled to additional time under this "exceptional circumstances" provision when the agency:

> is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

*Id.* at 616 (quoting 5 U.S.C. § 552(a)(6)(C)).

Congress subsequently amended the Freedom of Information Act to include two additional factors for the Court to consider in analyzing whether exceptional circumstances exist in a particular case:

> [T]he term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.
>
> Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) . . . after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

5 U.S.C. § 552(a)(6)(C)(ii)-(iii).  The legislative history of these amendments indicates that

Congress intended the amendments to be "consistent with the holding in *Open America*," and merely sought to "clarify that routine, predictable agency backlogs for FOIA requests do not constitute exceptional circumstances." H.R. Rep. 104–795 at 24 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3448, 3467.  Courts have routinely held that in addition to the issues outlined in the statute, other circumstances are relevant considerations when faced with a request for an *Open America* stay, including "an agency's efforts to reduce the number of pending requests, the amount of classified material, [and] the size and complexity of other requests processed by the agency." *Elec. Frontier Found. v. Dep't of Justice*, 517 F. Supp. 2d 111, 117 (D.D.C. 2007).

### III.  DISCUSSION

The Freedom of Information Act requires the FBI to make two showings before the Court may grant a stay of the proceedings: (1) that exceptional circumstances exist; and (2) that the FBI is "exercising due diligence" in responding to EPIC's request.  5 U.S.C. § 552(a)(6)(C)(i).  The FBI argues that its motion satisfies both requirements, and thus asks the Court to stay proceedings in this matter until October 31, 2014.  EPIC contends the FBI failed to make the necessary showing, and that the Court should instead order the FBI to (1) process all non-classified records within sixty days; (2) identify and account for all classified, responsive records within sixty days; and (3) complete processing of all classified, responsive records within six months (or less).  Pl.'s Opp'n at 1.  As set forth below, the Court finds the FBI failed to show that exceptional circumstances exist in this case, therefore the Court does not reach the parties' remaining arguments.[4]

---

[4] For the first time in its Reply, the FBI specifically argued that it has insufficient resources to response to the increased volume, size, and complexity of requests it receives, a factor the Court considered in *Buc v. Food & Drug Admin.*, 762 F. Supp. 2d 62 (D.D.C. 2011). *See* Def.'s Reply at 6-8.  The Court shall not consider arguments raised the FBI failed to raise in

### A.     *Number & Complexity of Requests*

Initially, the FBI argues that exceptional circumstances exist in this case because of the "marked increase" in the number of FOIA and Privacy Act requests the agency has received on an annual basis since FY 2005, as well as the increased complexity of those requests. Def.'s Mot. at 19-20. EPIC disagrees with the FBI's characterization of the underlying data, asserting that with the exception of certain isolated outlying years, the average number of incoming requests, measured on a monthly basis, has remained stable over the past twenty years. Pl.'s Mot. at 15-16. The FBI does not dispute the evidence relied on by EPIC, but rather contends that the Court's analysis should be limited solely to a comparison of the number of requests received in fiscal years 2011 and 2012. Def.'s Reply at 3. Certainly, aberrational spikes in the number of requests in any given year are relevant to the Court's analysis, even if the long-term rates generally remain static. But the FBI itself relies on multi-year comparisons at numerous points in its own motion, acknowledging that the Court's inquiry should in fact consider the data provided regarding FY 2011 and FY 2012 in a broader context.

The bottom line is that the FBI failed to show that it is "deluged with [a] volume of requests . . . vastly in excess of that anticipated by Congress." *Open America*, 547 F.2d at 616. The number of FOIA/Privacy Act requests received by the FBI increased from 17,755 in FY 2011 to 19,599 through the first eleven months of FY 2012. Second Hardy Decl. ¶ 5; Third Hardy Decl. ¶ 3. In its motion, the FBI did not provide the number of requests received in fiscal years prior to 2010, but the publicly available data reported by the Department of Justice indicates that the number of FOIA requests received by the FBI dropped by over 25% between

---

its initial motion. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

FY 2008 (17,241 requests) and FY 2012 (12,783 requests).[5] Though not directly comparable to the information provided by the FBI (insofar as it excludes of Privacy Act requests included in the FBI's totals), the data strongly suggests that the number of requests received by the FBI in the past two fiscal years is not "vastly in excess" of the volume anticipated by Congress, and, if anything, has dropped substantially over the past several fiscal years. The increase in requests between FY 2010 and FY 2011—which, excluding Privacy Act requests, increased by only 15—viewed in the context of the overall trend of decreased requests, does not demonstrate "exceptional circumstances."

The FBI also emphasizes that complexity of the requests it receives has increased significantly over time and that the average size of each request has more than doubled since FY 2009, both of which the FBI argues support a finding of exceptional circumstances. Second Hardy Decl. ¶ 6 (noting the average size of requests increased from 500 pages in FY 2009 to 1,128 pages in FY 2012). With respect to this latter point, as the agency admits, that increase is the Department of Justice's own doing. In 2009, the Department of Justice issued new FOIA guidelines, to which the FBI attributes the increased average size of requests. First Hardy Decl. ¶ 23. Beyond emphasizing the increased average of size of incoming requests, the FBI fails to articulate why the agency's own policy change should support a finding of exceptional circumstances, as opposed to being considered part of the "predictable workload" the statute specifically states does not justify a stay.

Admittedly, the number of requests involving more than 8,000 pages has increased since FY 2007, but today those requests still constitute less than three percent of all pending requests. *Cf.* Second Hardy Decl. ¶ 6 (disclosing 93 pending "behemoth" requests as of August 30, 2012)

---

[5] This data is available in the "data" section of foia.gov (last accessed Mar. 27, 2013).

*with id.* at ¶ 5 (indicating a backlog of 3,764 requests as of August 30, 2012). The Declarant avers that his "experience indicates that the number of requests with multiple parts has increased substantially in the past five years," Second Hardy Decl. ¶ 6, but "there is simply insufficient evidence in the record to draw any concrete and meaningful conclusions as to the composition of the [FBI's] workload today in comparison to years past, at least in terms of complexity." *Buc v. Food & Drug Admin.*, 762 F. Supp. 2d 62, 68 (D.D.C. 2011).

   B.   *Other FOIA Litigation*

The FBI also contends that the "exceptionally large number" of FOIA cases involving the FBI currently in litigation is further evidence of exceptional circumstances. Def.'s Mot. at 21. As examples, the First Hardy Declaration lists six cases pending against the FBI which require ongoing document productions. First Hardy Decl. ¶ 27. The deadline for the FBI to produce documents has since or will soon pass in three of the cases. *Id.* at ¶¶ 27 (b), (d), (e). Overall, this anecdotal evidence does not "permit the Court to draw any broader conclusions about the [FBI's] workload as it has developed over time." *Buc*, 762 F. Supp. 2d at 69. In other words, without more elaboration as to the FBI's litigation-related processing obligations over specific periods of time, the Court cannot determine what, if any, impact these obligations should have on the Court's analysis of the FBI's FOIA workload. If anything, the fact that the FBI indicated on August 1, 2012, that it anticipated being able to process approximately 5,000 pages per month in another case[6] demonstrates that the FBI is not facing such exceptional circumstances that it can only review 1,500 pages per month in response to EPIC's request.

   C.   *Classified Material*

As previously acknowledged by this Court, the amount of classified material involved in

---

[6] *Lardner v. FBI*, No. 03-874, Status Report, ECF No. [111] (D.D.C. filed Aug. 1, 2012).

a particular request is relevant to exceptional circumstances analysis. *Elec. Frontier Found.*, 517 F. Supp. 2d at 117. Here, the FBI estimates that performing classification/declassification review of an estimated 5,000 pages (25% of potentially responsive pages) would require approximately six months. Def.'s Reply at 8. Assuming *arguendo* EPIC's request contains a significantly greater amount of classified information than even the average "behemoth" request, by the FBI's own estimate this would only add six months of processing time, and only with respect to a subset of pages. The amount of classified material, even if considered with the other factors at issue, does not demonstrate exceptional circumstances justifying a stay of the length requested by the FBI.

      D.      *EPIC's Refusal to Narrow the Scope of Its Request*

The FBI notes that the EPIC refused its request to omit "classified" information and operating manuals from the scope of the request, and suggests this refusal should be relevant to the Court's exceptional circumstances analysis. Section 552(a)(6)(C)(iii) provides that "[r]efusal by a person to reasonably modify the scope of a request . . . shall be considered as a factor in determining whether exceptional circumstances exist." EPIC faults the FBI for a vague offer to exclude documents, and the FBI faults EPIC for not seeking clarification of that issue. On balance, the considers EPIC's refusal as a factor weighing in favor of finding exceptional circumstances, but the record as a whole does not demonstrate exceptional circumstances exist.

      E.      *FBI's Efforts to Reduce Its Request Backlog*

If, as here, the agency can show no more than a "predictable agency workload of requests," exceptional circumstances will not lie "unless the agency [further] demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). The FBI points to the restructuring of its FOIA processing division as evidence of its

commitment to reducing the backlog.  While admirable, the numbers belie any claim that the FBI's progress in reducing its backlog has been "reasonable."  Assuming the FBI received 1,781 additional FOIA/Privacy Act requests in September 2012 (the average for the eleven months prior), between FY 2011 and FY 2012, the number of FOIA/Privacy Act requests received by the FBI increased by 20%, yet the backlog of requests at the end of each year increased by nearly 220%.[7]  *See* First Hardy Decl. ¶ 24; Second Hardy Decl. ¶ 5.  Using the publicly available data, the number of FOIA requests received by the FBI increased by 15% in FY 2012, but the backlog of requests increased by 65%.  For broader context, consider that the FBI backlog of FOIA requests increased by 55% between FY 2008 (1476 pending requests) and FY 2012 (2296 pending requests), despite a 27% *decrease* in new FOIA requests.  The FBI's efforts to increase the efficiency of its system for processing FOIA requests is certainly commendable, but on this record the Court cannot find that these efforts have led to "reasonable progress" in reducing the agency's backlog.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds the FBI failed to demonstrate exceptional circumstances exist to justify a stay of these proceedings until October 31, 2014.  The number of FOIA and Privacy Act requests received by the FBI increased during FY 2012 as compared to the prior year, but overall the number of requests the FBI receives on a yearly basis has decreased significantly since FY 2008.  The average size of such requests has nearly doubled since FY 2009, but the FBI readily admits that increase is due to agency regulations.  Moreover, outside of anecdotal evidence to suggest more and more requests contain subparts, the FBI did

---

[7]  This calculation is an approximation insofar as it uses the number of backlogged requests for FY 2012 with one month remaining in the fiscal year.  Second Hardy Decl. ¶ 5.

not provide the Court with sufficient information from which it could conclude that the overall complexity of the FBI's workload has increased over time. The FBI is involved in other litigation regarding FOIA requests, but the FBI's representations in those cases belie its claim that its workload is vastly greater than what Congress anticipated such that it should only be required to process 1,500 pages relating to EPIC's request per month. The amount of classified material involved in EPIC's request as well as EPIC's refusal to narrow its request as suggested by the FBI support a stay to some degree, but considering the record as a whole, exceptional circumstances do not exist. Finally, although the FBI has implemented changes to increase the efficiency of its FOIA processing system, the increase in its backlog of requests is vastly disproportionate to the increased number of requests, precluding a finding that the FBI has made reasonable progress in reducing its backlog. Therefore, the Court finds the FBI failed to make the threshold showing that exceptional circumstances exist as required for a stay of proceedings under 5 U.S.C. § 552(a)(6)(C)(i). Accordingly, the FBI's [14] Motion for an Open America Stay is DENIED.

The FBI indicated in its motion that its FOIA processing unit received the 25,000 potentially responsive pages by no later than July 30, 2012. First Hardy Decl. ¶ 21. Therefore, as set forth in the accompanying Order, the FBI shall be required to produce all responsive, non-exempt records not subject to classification/declassification review on a rolling basis, but in any event by no later than **August 1, 2013**. Furthermore, by no later than **May 31, 2013**, the FBI shall indicate how many pages are subject to classification/declassification review, and propose a deadline for completing production of those documents, as appropriate.

>              */s/*
> **COLLEEN KOLLAR-KOTELLY**
> UNITED STATES DISTRICT JUDGE