**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ELECTRONIC PRIVACY** | ) | |
| **INFORMATION CENTER** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.  1:12-cv-00667(CKK) |
| | ) | |
| **FEDERAL BUREAU** | ) | |
| **OF INVESTIGATION** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES AND COSTS**

STUART F. DELERY
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

KIMBERLY L. HERB
(Illinois Bar # 6296725)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel: (202) 305-8356
Fax: (202) 616-8470

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .......................................................................................................1

I.      PLAINTIFF'S FOIA REQUEST AND THE FBI'S RESPONSE ....................................1

II.     THE FBI'S SEARCH .....................................................................................................3

III.    THE FBI'S PROCESSING OF PLAINTIFF'S FOIA REQUEST ...................................3

IV.    THE RESOLUTION OF PLAINTIFF'S SUBSTANTIVE LEGAL CLAIMS .................6

STANDARD OF REVIEW ......................................................................................................7

ARGUMENT ..........................................................................................................................9

I.      EPIC IS NOT ENTITLED TO FEES ............................................................................9

      A.     The Disclosed Records Did Not Benefit the Public................................................10

             1.     Neither Plaintiff's Website Nor the Articles Cited in Its
                    Brief Demonstrate Public Benefit..............................................................11

             2.     EPIC Has Not Demonstrated that the Public Benefited
                    From Its Newsletter.....................................................................................15

      B.     The FBI Had a Reasonable Basis for Its Action ....................................................16

II.     EPIC'S FEE REQUEST FOR $34,152.50 IS UNREASONABLE...................................18

      A.     The Hours Spent for Drafting, Reviewing, Discussing and Filing the
            Complaint Are Unreasonable and Should Be Significantly Reduced ...................19

      B.     The Hours Spent Preparing a Proposed Scheduling Order Are
            Unreasonable and Should Be Reduced .................................................................20

      C.     EPIC Is Not Entitled to Fees for Reviewing Documents and Other
            Work Performed After the Court's Order on the *Open America*
            Stay Request..........................................................................................................21

      D.     The Hourly Rate Sought By EPIC for Alan Butler and Julie
            Horwitz Should Be Reduced.................................................................................23

E.      EPIC's Billing Records Contain Several Anomalies with Respect to a Joint Status Report on August 29, 2013.........................................................25

F.      EPIC's Recovery of Fees on Fees, if any, Should Be Adjusted Downward to the Extent Its Fees Petition Is Unsuccessful ..................................25

III.      BECAUSE DEFENDANT SERVED AN OFFER OF JUDGMENT ON PLAINTIFF, THE COURT SHOULD DIVIDE ANY FEE AWARD INTO FEES INCURRED UNTIL AND AFTER THAT DATE......................................26

CONCLUSION.................................................................................................................28

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Ajluni v. FBI*,
    947 F. Supp. 599 (N.D.N.Y. 1996) ...................................................................22

*Alliance for Responsible CFC Policy v. Costle*,
    631 F. Supp. 1469 (D.D.C. 1986) .................................................................10

*B.L. Through Lax v. District of Columbia*,
    517 F. Supp. 2d 57 (D.D.C. 2007) .................................................................26

*Baker v. D.C. Public Schools*,
    815 F. Supp. 2d 102 (D.D.C. 2011) .................................................................23

*Brown v. Stackler*,
    612 F.2d 1057 (7th Cir.1980) ........................................................................9

*Burka v. HHS*,
    142 F.3d 1286 (D.C. Cir. 1998) ....................................................................8

*CREW v DOJ*,
    825 F. Supp. 2d 226, 231 (D.D.C. 2011) .....................................................22

*Church of Scientology of Cal. v. Harris*,
    653 F.2d 584 (D.C. Cir. 1981) ..................................................................8, 9

*Church of Scientology v. U.S.P.S.*,
    700 F.2d 486 (9th Cir. 1983) ........................................................................16

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*,
    No. 1:10cv850 (unpublished) .......................................................................26

*Comm'r, I.N.S. v. Jean*,
    496 U.S. 154 (1990) ......................................................................................25

*Cotton v. Heyman*,
    63 F.3d 1115 (D.C. Cir. 1995) .................................................................10, 15

*Davy v. CIA*,
    550 F. 3d 1155 (D.C. Cir. 2008) ....................................................................9

*Dickens v. Friendship-Edison P.C.S.*,
    724 F. Supp. 2d 113 (D.D.C. 2010) ...............................................................23

*EPIC v. Dep't of Homeland Security,*
    No. 11-2261, 2013 WL 6047561, *3-4 (D.D.C. Nov. 15, 2013).............................. *passim*

*EPIC v. U.S. Department of Homeland Security,*
    No. 10-1992, 2013 WL 5620891 (D.D.C. Oct. 15, 2013)  ................................................17

*EPIC v. U.S. Department of Homeland Security,*
    811 F. Supp. 2d 216 (D.D.C. 2011) ...............................................................................15

*Elec. Frontier Found. v. Office of Dir. Of Nat'l Intelligence, No. C 07-05278,*
    2008 WL 2331959 (N.D. Cal. June 4, 2008) ..................................................................20

*Ellis v. United States,*
    941 F. Supp. 1068 (D. Utah 1996)..................................................................................17

*Envtl. Defense Fund, Inc. v. Reilly,*
    1 F.3d 1254 (D.C. Cir. 1993) ...........................................................................................9

*Farris v. Cox,*
    508 F. Supp. 222 (N.D. Cal. 1981) ..................................................................................9

*Goos v. Nat'l Ass'n of Realtors,*
    68 F.3d 1380 (D.C. Cir. 1995) .......................................................................................27

*Hensley v. Eckerhart,*
    461 U.S. 424 (1982).........................................................................................................9

*Kennedy v. Andrus,*
    459 F. Supp. 240 (D.D.C. 1978) ....................................................................................21

*LaShawn A. v. Barry,*
    1998 WL 35243112 (D.D.C. Feb. 18, 1998) ..................................................................25

*Lane v. Pea,*
    518 U.S. 187 (1996).......................................................................................................21

*Marek v. Chesney,*
    473 U.S. 1 (1985).....................................................................................................26, 27

*N.Y.C. Apparel F.Z.E. v. U.S. Customs & Border Prot. Bureau,*
    563 F. Supp. 2d 217 (D.D.C.2008) ............................................................................8, 21

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affairs,*
    No. 96-CV-01740, 1999 WL 33740260 (D.D.C. Apr. 13, 1999).....................................25

*Pub. Law Educ. Inst. v. DOJ,*
 744 F.2d 181 (D.C. Cir. 1984) ...................................................................................8

*Read v. Federal Aviation Admin.,*
 252 F. Supp. 2d 1108 (W.D. Wash. 2003) ...............................................................16

*Rigmaiden v. FBI*
 Civ. 12-01605 (D. Ariz. filed July 26, 2012) ............................................................7

*Simon v. United States,*
 587 F. Supp. 1029 (D.D.C. 1994) .......................................................................16, 17

*Steenland v. CIA,*
 555 F. Supp. 907 (W.D.N.Y. 1983) .........................................................................22

*Tax Analysts v. DOJ,*
 965 F.2d 1092, 1097 (D.C. Cir. 1992) .....................................................................17

*Tunison v. Continental Airlines Corp.,*
 162 F.3d 1187 (D.C. Cir. 1998) ................................................................................26

*Uhuru v. U.S. Parole Comm'n,*
 734 F. Supp. 2d 8 (D.D.C. 2010) ........................................................................22, 23

*United America Financial, Inc. v. Potter,*
 770 F. Supp. 2d 252 (D.D.C. 2011) ..........................................................................17

*United States v. Rigmaiden*,
 08-cr-814 (D. Az. filed July 28, 2008) ......................................................................14

*Webman v. Fed. Bureau of Prisons,*
 441 F.3d 1022 (D.C. Cir. 2006) ................................................................................21

*Weisberg v. DOJ,*
 745 F.2d 1476 (D.C. Cir. 1984) ...........................................................................8, 22

**STATUTES**

5 U.S.C. § 552(a)(4)(E)(ii) ................................................................................... *passim*

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 68 ......................................................................................................26

**MISCELLANEOUS**

Ellen Nakashima, *Little-known Surveillance Tool Raises Concerns by Judges,
Privacy Activists*, Washington Post, March 27, 2013 .......................................................12

Eric Lichtblau, *Police Are Using Phone Tracking as a Routine Tool*,
N.Y. Times, March 31, 2012 .................................................................................................12

Jennifer Valentino-Devries, *'Stingray' Phone Tracker Fuels Constitutional Clash*,
Wall Street Journal, Sept. 22, 2011............................................................................11, 14

John Kelly, *Law Enforcement Using Methods From NSA Playbook*,
USA Today, Dec. 8, 2013.....................................................................................................13

Kim Zetter, *Secrets of FBI Smartphone Surveillance Revealed in Court Fight*,
Wired, April 9, 2013 .............................................................................................................12

Kim Zetter, *Feds' Use of Fake Cell Tower: Did it Constitute a Search?*,
Wired, Nov. 3, 2011..............................................................................................................14

Nadia Pfaum & Russ Ptacek, *DC, Maryland and Virginia Cops Spying on
Cell Phone Data*, Dec. 9, 2013 ..........................................................................................13

Rachel Myers, *With Technology Like This, Who Needs the Law* .................................................11

Ryan Gallagher, *DoJ Accused of Illegally Withholding Info on Clandestine
Cellphone Surveillance Tool*, Slate Future Tense Blog, July 24, 2013 ...........................14

Ryan Gallagher, *FBI Accused of Dragging Feet on Release of Info About 'Stingray'
Surveillance Technology*, Slate Future Tense Blog, Oct. 19, 2012 ..................................14

Ryan Gallagher, *Meet the Machines that Steal Your Phone's Data*,
ArsTechnica, September 25, 2013 .......................................................................................13

Ryan Singel, *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs*,
Wired, December 20, 2007 ............................................................................................11, 13

Shaun Waterman, *Can you hear me now? Feds admit FBI warrantless cellphone
tracking 'very common'*, The Washington Times, March 29, 2013 .................................12

Wright & Miller, *Federal Practice and Procedure*, § 300668 .....................................................26

**INTRODUCTION**

In this Freedom of Information Act ("FOIA") action in which Plaintiff has not contested *any* of the FBI's withholdings or the adequacy of its search, EPIC asserts that it is entitled to $34,152.50 in fees and costs. EPIC's motion should be denied. As a threshold matter, EPIC has not established that it is entitled to attorneys' fees and costs—it failed to demonstrate that the public benefited from the release of documents under Court order and the FBI's response to EPIC's FOIA request was reasonable, even if delayed. Even if EPIC was entitled to some fees for its efforts opposing the FBI's Motion for an *Open America* Stay, EPIC's fee request is inherently unreasonable and must be reduced. EPIC seeks extensive fees for the filing of boilerplate documents with which it has great familiarity and experience. Additionally, EPIC seeks fees for work that it would have undertaken in the ordinary course of business, such as the review of responsive records, and for work that was not necessary to or that resulted in the production of responsive documents. Finally, EPIC's request includes unreasonable fees based on billing anomalies and an incorrect billing rate for two of its attorneys.

**STATEMENT OF FACTS**

**I.      PLAINTIFF'S FOIA REQUEST AND THE FBI'S RESPONSE**

This case concerns a FOIA request for records concerning technology that can be used to locate and track cell phones. On February 10, 2012, Plaintiff submitted a FOIA request by fax to the FBI seeking "agency records concerning the government's use of cell-site simulator, or 'StingRay,' technology to track cell phones and other wireless devices." (Compl., Dkt. 1, ¶ 2.) Specifically, Plaintiff requested:

1.   All documents concerning technical specifications of the StingRay device or other cell site simulator technologies; and

1

2. All documents concerning procedural requirements or guidelines for the use of StingRay device or other cell site simulator technologies (e.g. configuration, data retention, data deletion); and

3. All contracts and statements of work that relate to StingRay device or other cell site simulator technologies; and

4. All memoranda regarding the legal basis for the use of StingRay device or other cell-site simulator technologies;

5. All Privacy Impact Assessments or Reports concerning the use or capabilities of StingRay device or other cell-site simulator technologies.

(*Id.* ¶ 20.)

The FBI acknowledged receipt of Plaintiff's request in a letter dated February 16, 2012 and advised that it was searching the general indices of the Central Records System for information responsive to the request. (First Hardy Decl., July 30, 2012, attached as Exhibit 1, ¶ 6.)[1] It also notified Plaintiff that its fee waiver request was under consideration. (*Id.*) Plaintiff administratively appealed the FBI's failure to make a timely determination regarding Plaintiff's FOIA request to the Office of Information Policy ("OIP"), Department of Justice ("DOJ") on March 19, 2012. (*Id.* ¶ 7.) OIP-DOJ acknowledged receipt of Plaintiff's appeal on April 5, 2012. (*Id.* ¶ 8.) Plaintiff filed the instant lawsuit on April 26, 2012. (Compl., Dkt. 1)

Subsequently, the FBI and OIP-DOJ sent several letters to Plaintiff regarding its FOIA request. By letter dated May 22, 2012, OIP-DOJ informed Plaintiff that it was closing the administrative appeal because the matter was now before the Court. (First Hardy Decl., Ex. 1, ¶ 10.) The FBI then granted Plaintiff's fee waiver request by letter dated June 4, 2012. (*Id.* ¶ 11.) Also in a letter dated June 4, 2012, the FBI notified Plaintiff that its request for expedited processing was denied. (*Id.* ¶ 12.) The FBI advised Plaintiff that it had not provided enough information – and specifically had failed to demonstrate an urgency to inform the public about

---

[1] While the First Hardy Declaration was filed with the Court previously, (Dkt. 14-1), it is reattached here for ease of reference.

2

the subject of its FOIA request – sufficient to fall within the statutory requirements permitting expedition.  (*Id.*)

## II.      THE FBI'S SEARCH

Because the subject matter of Plaintiff's request did not lend itself to a search of the general indexes of the FBI's Central Records System, the FBI decided to conduct a more individualized inquiry of certain FBI divisions and offices that were reasonably likely to have potentially responsive records.  (*Id.* ¶ 17-19.)  However, because the FBI had circulated an Electronic Communication ("EC") in February 2012 in response to a November 2011 FOIA request that was similar to EPIC's request in February 2012, the FBI analyst assigned to Plaintiff's case decided to wait to see if any material obtained in response to the November 2011 FOIA request might also be responsive to Plaintiff's request.  (*Id.* ¶ 19)  If the responsive records were indeed the same, both FOIA cases could be pre-processed together for a concurrent release. (*Id.*)  The FBI subsequently determined that it would send a search EC specifically related to Plaintiff's request on May 23, 2012.  (*Id.* ¶ 20.)  Ultimately, the FBI received 22,982 documents that were potentially responsive to Plaintiff's request, and thus needed to be reviewed for possible release.  (Fifth Hardy Decl., Jan. 15, 2014, attached as Ex. 2, ¶ 20.)

## III.    THE FBI'S PROCESSING OF PLAINTIFF'S FOIA REQUEST

Pursuant to the Court's order requiring the filing of a Joint Proposed Schedule, the parties offered alternative schedules for the production of documents.  (Joint Proposed Schedule, Dkt. 12, at 2.)  Plaintiff proposed that the FBI complete the production of documents and a *Vaughn* index by August 27, 2012.  (*Id.*)  The FBI responded that it could not process the high volume of material implicated in this case on such a schedule.  (*Id.* at 3.)  Nevertheless, the FBI "offered to review a minimum of 1,000 pages a month of documents potentially responsive to Plaintiff's

FOIA request," commencing in September 2012.  (*Id.*)  Additionally, the FBI proposed that it would complete the processing and production of responsive documents by October 31, 2014. (*Id.*)

On July 1, 2012, the Court issued an Order stating it was "not in a position to evaluate the merits of the FBI's request on the basis of the parties' status report alone."  (Dkt. 13 at 2.)  It further stated that "[t]he Court currently lacks sufficient information to evaluate [] the exceptional circumstances the FBI might be facing."  (*Id.*)  Accordingly, the Court ordered the FBI to file a motion for an *Open America* stay and stated that it would adopt Plaintiff's proposed schedule if the FBI failed to do so.  (*Id.*)  The FBI filed for an *Open America* stay on July 30, 2012, (Dkt. 14), and briefing was complete on August 30, 2012, (Dkt. 16).

While the FBI's request for an *Open America* stay was pending before the Court, and despite the fact that no production schedule had been accepted by Plaintiff or the Court, the FBI nevertheless began to process and produce documents on a rolling basis, with the first production completed on October 3, 2012.  (Fifth Hardy Decl., Ex. 2, ¶ 6.)  The FBI's produced eight interim releases during the pendency of the FBI's Motion for an *Open America* Stay, and those releases involved a review of 7,218 documents and the release of 695 pages, as detailed below:

(1) for the FBI's first interim release on October 3, 2012, it reviewed 1,015 pages and released, in full or part, 39, (*id.*);

(2) for the second interim release on November 15, 2012, it reviewed 924 pages and released 0 pages, (*id.* ¶ 7);

(3) for the third interim release on December 7, 2012, it reviewed 1,132 pages and released, in full or part, 62, (*id.* ¶ 8);

(4) for the fourth interim release on December 31, 2012, it reviewed 1,131 and released, in full or part, 157, (*id.* ¶ 9);

(5) for the fifth interim release on February 7, 2013, it reviewed 611 pages and released, in full or part, 231 pages, (*id.* ¶ 10);

(6) for the sixth interim release on February 22, 2013, it reviewed 443 reviewed pages and released, in full or part, 116 pages, (*id.* ¶ 11);

(7) for the seventh interim release on February 28, 2013, it reviewed 1,086 pages and released 0 pages, (*id.* ¶ 12);

(8) for the eighth interim release on March 29, 2013, it reviewed 876 pages and released, in full or part, 90, (*id.* ¶ 14).[2]

On March 28, 2013, the Court denied the FBI's Motion for an *Open America* Stay.  (Dkt. 19.)  The Court found that "the FBI has not demonstrated exceptional circumstances exist so as to warrant the fourteen-month stay of proceedings requested by the FBI."  (*Id.* at 1.)  Accordingly, the Court ordered that "the FBI shall be required to produce all responsive, non-exempt records not subject to classification/declassification review on a rolling basis, but in any event by no later than August 1, 2013."  (*Id.* at 12.)  It further ordered that the FBI indicate, by May 31, 2013, how many pages were subject to classification review and propose a deadline for the production of those documents.  (*Id.*)  In response to the Court's Order, on May 30, 2013, the FBI informed the Court that it had identified 3,335 classified pages responsive to Plaintiff's request and stated that it would produce those by August 1, 2013.  (Dkt. 21 at 1-2.)  In a Minute

---

[2] While the FBI's eighth interim release was mailed the day after the Court issued its Order denying the FBI's Motion for an *Open America* Stay, the materials included in this release had been reviewed and processed well before the Court issued its Order; at the time of the Order, the release was only awaiting a final review of the correspondence that accompanied it.  (Fifth Hardy Decl., Ex. 2, ¶ 14.)  Accordingly, the eighth interim release is included here for purposes of calculating the pages processed and released prior to the Court's issuance of its Order.

Order dated May 31, 2013, the Court then ordered that the FBI produce all responsive pages no later than August 1, 2013.

The FBI continued to produce documents on a rolling basis to Plaintiff following the Court's Order.  In fact, the FBI issued five additional releases to Plaintiff following the Court's *Open America* Order, as discussed below:

(1) for the ninth interim release on April 30, 2013, the FBI reviewed 1,290 pages of responsive records and released, in full or part, 420, (Fifth Hardy Decl, Ex. 2,. ¶ 15);

(2) for the tenth interim release on May 31, 2013, it reviewed 2,646 pages and released, in full or part, 217, (*id.* ¶ 16);

(3) for the eleventh interim release on June 28, 2013, it reviewed 5,678 pages and released, in full or part, 1,212, (*id.* ¶ 17);

(4) for the twelfth interim release on July 12, 2013, it reviewed 5,224 pages and released, in full or part, 1,329, (*id.* ¶ 18);

(5) for the FBI's final release on July 30, 2013, it reviewed 926 pages and released, in full or part, 504, (*id.* ¶ 19).

In total, the FBI reviewed and processed 22,982 pages of responsive material and released, in full or part, 4,377 pages.  (*Id.* 20.)  Of the 4,377 pages released, nearly sixteen percent (695 pages) were reviewed and released prior to the Court's Order on the FBI's request for an *Open America* stay, while eighty-four percent (3,682 pages) were reviewed and released after the Court's Order.

## IV.    THE RESOLUTION OF PLAINTIFF'S SUBSTANTIVE LEGAL CLAIMS

On August 29, 2013, pursuant to the Court's request for the filing of a Joint Status Report, (*see* Minute Order, May 31, 2013), the parties informed the Court that they were seeking to resolve the case prior to summary judgment.  (Joint Status Report, Dkt. 23, at 3.)  The FBI

agreed to provide Plaintiff with a draft *Vaughn* index for a sample of up to 500 pages of responsive documents.  (*Id.*)  Due to developments in another FOIA case involving a request similar to Plaintiff's, the FBI also indicated that its review might reveal additional terms that could be released at same time as the draft *Vaughn* index.  (Fifth Hardy Decl., Ex. 2, ¶ 21.)  Specifically, as a result of a court filing in *Rigmaiden v. FBI*, Civ. 12-01605 (D. Az. filed July 26, 2012), "the [Rigmaiden] Plaintiff provided sufficient information for the FBI to reconsider whether it should continue to withhold certain identified aspects and/or terms relating to contracts with FBI contractor Harris, and certain cell-site simulator technology information" that were potentially in the public domain.  (*Id.* ¶ 4.)  While the FBI's determination in the *Rigmaiden* case to revisit certain terms post-dated the FBI's review and production of documents responsive to EPIC's FOIA request, the FBI offered as a courtesy to disclose any of the newly revealed terms that it came across in the 500-page sample as it prepared the draft *Vaughn* index.  (*Id.* ¶ 21.)  The FBI then produced a draft *Vaughn* index (as a narrative *Vaughn*) to counsel on October 1, 2013, and counsel conveyed that to Plaintiff on the same day.  (*Id.*)

The parties informed the Court on November 1, 2013 that they had resolved the substantive legal issues underlying this action, with the exception of fees and costs.  (Joint Status Report, Nov. 1, 2013, Dkt. 25, ¶ 8.)  The parties sought fourteen days to consider whether they could settle the issues of attorneys' fees and costs.  (*Id.* ¶ 9.)  On November 12, 2013, the parties advised the Court that they had been unable to reach an agreement on fees and set forth a proposed briefing schedule to resolve this issue.  (Joint Status Report, Nov. 12, 2013, ¶ 2-3.)

## STANDARD OF REVIEW

The FOIA statue provides that a "court may assess against the United States reasonable fees and other litigation costs reasonably incurred in any case . . . in which the complainant has

substantially prevailed." 5 U.SC. § 552(a)(4)(E)(i). A plaintiff must satisfy a two-step inquiry in order to receive fees and costs in a FOIA action. First, a plaintiff must show that it is eligible for an award. To meet this standard, a plaintiff must show that it has "substantially prevailed," which requires that it obtained relief through either (1) "a judicial order, or an enforceable written agreement or consent decree;" or (2) "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). The second of these two options "essentially codifies the so-called 'catalyst theory'" of recovery, under which a plaintiff is eligible for fees if the "litigation substantially caused the requested records to be released." *N.Y.C. Apparel F.Z.E. v. U.S. Customs & Border Prot. Bureau*, 563 F. Supp. 2d 217, 221 (D.D.C. 2008) (internal citation omitted). To recover attorneys' fees under this theory, "a litigant must . . . show[] that the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released." *Burka v. HHS*, 142 F.3d 1286, 1288 (D.C. Cir. 1998). Although it is a "salient factor" in the analysis, "the mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation." *Weisberg v. DOJ*, 745 F.2d 1476, 1496 (D.C. Cir. 1984); *Pub. Law Educ. Inst. v. DOJ*, 744 F.2d 181, 184 n.5 (D.C. Cir. 1984) ("While the temporal relation between an FOIA action and the release of documents may be taken into account in determining the existence *vel non* of a causal nexus, timing, in itself or in conjunction with any other particular factor, does not establish causation as a matter of law.").

The determination as to whether to award fees, however, does not end with eligibility, as a FOIA plaintiff also must show that it is entitled to such fees. *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 590 (D.C. Cir. 1981). The entitlement inquiry examines (1) the public benefit derived from the case; (2) the commercial benefit to the complainant; (3) the nature of the

complainant's interest in the records sought; and (4) whether the government's withholding had a reasonable basis in law. *See Davy v. CIA*, 550 F. 3d 1155, 1159 (D.C. Cir. 2008). Ultimately, the decision on whether a plaintiff is entitled to attorneys' fees "rests in the sound discretion of the district court." *Church of Scientology*, 653 F.2d at 590.

Finally, even if a plaintiff is eligible and entitled to fees, the court may grant only those fees that are "reasonable." 5 U.S.C. § 552(a)(4)(E). An appropriate starting point is typically the lodestar, a reasonable number of hours multiplied by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1982). Moreover, because a decision to award fees is discretionary, a court "may deny in its entirety a request for an 'outrageously unreasonable' amount, lest claimants feel free to make 'unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place.'" *Envtl. Def. Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993) (*quoting Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir.1980)). If overbilling is less egregious but still unreasonable, the Court "may impose a lesser sanction, such as awarding a fee below what a 'reasonable' fee would have been in order to discourage fee petitioners from submitting an excessive request." *Id.* (*citing Farris v. Cox*, 508 F. Supp. 222, 227 (N.D. Cal. 1981)).

## ARGUMENT

## I.    EPIC IS NOT ENTITLED TO FEES

EPIC is not entitled to attorneys' fees and costs in this case. Courts primarily consider four factors in determining whether a plaintiff who is eligible for fees is also entitled to such fees: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) whether the government has a

reasonable basis for withholding the requested information." *Cotton v. Heyman,* 63 F.3d 1115, 1117 (D.C. Cir. 1995). Based a consideration of the factors, this Court should find that EPIC is not entitled to attorneys' fees.

### A.     The Disclosed Records Did Not Benefit the Public

In evaluating the public benefit factor, courts have held that "[t]he simple disclosure of government documents does not satisfy the public interest factor." *Alliance for Responsible CFC Policy v. Castle,* 631 F. Supp. 1469, 1471 (D.D.C. 1986). Instead, the public benefit prong focuses on whether the information received "is likely to add to the fund of information that citizens may use in making vital political choices." *Cotton,* 63 F.3d at 1120. This inquiry should focus on the "specific documents at issue in the case at hand." *Id.* In this case, EPIC argues that the documents it received benefited the public because (1) EPIC maintains a popular website for searches involving the term "privacy," (2) there has been "public debate over the use of these devices" as a result of the released documents, and (3) EPIC disseminates a newsletter to approximately 8,000 subscribers on a bi-weekly basis. (Pl.'s Mot. at 9.)

None of the arguments offered by EPIC demonstrate a public benefit. For purposes of the first two arguments, which can be considered together, it is helpful to review the "Top News" and "News Items" entries on EPIC's website, as well as the five articles cited in Plaintiff's brief to support the alleged public benefit from documents produced following the Court's *Open America* Order. This examination reveals that much of what Plaintiff claims to have disseminated was already in the public domain or did not arise from documents produced following the Court's Order. With respect to the third argument, EPIC has not proffered any evidence that its bi-weekly newsletter contained a substantive discussion of any of the documents released in this case following the Court's *Open America* Order, let alone that the

newsletter was anything more than an email blast to a general list of subscribers interested in a variety of topics related to privacy or electronic media.

        1.   <u>Neither Plaintiff's Website Nor the Articles Cited in Its Brief Demonstrate Public Benefit</u>

In its Motion, Plaintiff itself acknowledged that "[t]he use of cell phone tracking technologies has been the subject of intense public debate for several years," and cites to articles dating from 2006 that discuss the technology.  (Pl's Mot. a 10.)  Indeed, a cursory review of documents related to cell-site simulator technologies revealed a number of articles about the technology, its use by law enforcement, and its legal implications.  For instance, in 2007, *Wired* magazine published an article that referenced "[a] special surveillance unit called the Wireless Intercept and Tracking Team (WITT)" employed by the FBI that "use[es] the cell site location to get the approximate location of the cellphone customer," and it discussed internal FBI concerns about its work.  Ryan Singel, *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs*, Wired, Dec. 20, 2007, http://www.wired.com/politics/onlinerights/news/2007/12/fbi_cell?currentPage=all (attached as Ex. 3).  A 2008 article on the American Civil Liberties Union ("ACLU") website (and published elsewhere) discussed the development of "triggerfish" technology and the FBI's use of that technology to locate a cell phone without the use of a cell phone service provider and questioned whether it would be used without court permission.  Rachel Myers, *With Technology Like This, Who Needs the Law*, https://www.aclu.org/blog/free-speech-national-security/technology-who-needs-law, ACLU, Nov. 14, 2008 (attached as Ex. 4).  In addition, a 2011 article in the *Wall Street Journal* stated that "Stingrays are one of several new technologies used by law enforcement to track people's locations, often without a search warrant."  Jennifer Valentino-Devries, *'Stingray' Phone Tracker Fuels Constitutional Clash*, Wall Street Journal, Sept. 22, 2011 (attached as Ex. 5).  And articles throughout 2012 and 2013

recounted the findings derived from extensive FOIA requests from the ACLU and Electronic

Frontier Foundation to law enforcement agencies concerning the use of cell-site simulator

technology.  *See, e.g.*, Eric Lichtblau, *Police Are Using Phone Tracking as a Routine Tool*, N.Y.

Times, Mar. 31, 2012 (attached as Ex. 6); Ellen Nakashima, *Little-known Surveillance Tool*

*Raises Concerns by Judges, Privacy Activists*, Washington Post, March 27, 2013 (attached as Ex.

7); Shaun Waterman, *Can you hear me now? Feds admit FBI warrantless cellphone tracking*

*'very common'*, The Washington Times, Mar. 29, 2013 (attached as Ex. 8); Kim Zetter, *Secrets*

*of FBI Smartphone Surveillance Tool Revealed in Court Fight*, Wired, Apr. 9, 2013 (attached as

Ex. 9).  Given Plaintiff's own acknowledgement that there had been extensive public debate over

this topic for years, it must make a compelling showing that newly released documents

substantially broadened or aided that debate.

Yet, a review of the news articles listed on EPIC's website and in its opening brief

reveals that the vast majority of those articles simply reiterated information that was already in

the public domain by the time the FBI began producing documents pursuant to the Court's

March 2013 Order on the *Open America* stay.  Two of the items listed on the top of EPIC's

website under the "Top News" heading – "EPIC FOIA Documents Shed Light on Secret Cell

Phone Tracking Team at FBI" and "EPIC Obtains New Documents About FBI Cellphone

Tracking Technology," https://epic.org/foia/fbi/stingray/ – recount the same basic information

that was detailed in the articles above dating from 2007 and to just prior to the Court's *Open*

*America* Order.  Similarly, two news articles cited on both Plaintiff's website, *id.*, and in its brief,

(Pl.'s Mot at 9) – articles for *Slate*'s "Future Tense" blog dated January 10, 2013 and October 8,

2013 – revealed that there were concerns about the legal implications of the use of cell-site

simulator devices and the existence of the Wireless Intercept Tracking Team, respectively.

However, Plaintiff itself acknowledged that there has been long-standing public debate about the legal implications of the use of the technology, and the existence of the FBI's WITT team had been discussed as early as 2007 as indicated above.  *See* Singel, *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs*, Wired, Dec. 20, 2007 (discussing "[a] special surveillance unit called the Wireless Intercept and Tracking Team (WITT)").

Moreover, the news articles on EPIC's website and cited in Plaintiff's Motion discuss information that is largely derived information from three sources unrelated to the documents actually produced in this case.  In the first category, EPIC attempts to demonstrate public benefit on the basis of articles that reveal information obtained, *not through EPIC's efforts* but rather through FOIA requests (non-litigation) and independent investigations by *third parties*.  For example, while EPIC cites to a news story on WUSA9's website to demonstrate public benefit, (Pl.'s Mot. at 9), that article plainly states that the information was derived as a result of "a joint investigation with Gannett television stations across the country and *USA Today*."  Nadia Pfaum & Russ Ptacek, *DC, Maryland and Virginia Cops Spying on Cell Phone Data*, WUSA, Dec. 9, 2013, http:// http://www.wusa9.com/news/ article/ 285084/189/DC-area-police-spying-on-cell-phone-data (attacched as Ex. 14).  Other articles falling into the category include the following: John Kelly, *Law Enforcement Using Methods From NSA Playbook*, USA Today, Dec. 8, 2013 (cited in Pl.'s Mot. at 9 and reporting information derived from "public records obtained by USA Today and Gannett newspapers and TV stations") (attached as Ex. 12), and Ryan Gallagher, *Meet the Machines that Steal Your Phone's Data*, ArsTechnica, Sept. 25, 2013 (cited on Pl.'s website and reporting information compiled "by scrutinizing publicly available purchasing contracts published on government websites and marketing materials obtained through equipment resellers") (attached as Ex. 13).

In the second category, EPIC cites demonstrate public benefit on the basis of information derived from legal proceedings in other cases.  For instance, two articles listed in the "Top News" section of Plaintiff's website – identified by the titles "EPIC FOIA - FBI Says 20% Error Rate Okay for Facial Recognition" and "EPIC Sues FBI to Obtain Details of Massive Biometric ID Database" – arise from litigation related to a separate EPIC FOIA request related to the "Next Generation Identification" program, and not this case. *Id.*  (embedding links to EPIC's FOIA litigation in *EPIC v. FBI*, 13-cv-442 (D.D.C. filed April 8, 2013).[3]  And in the third category, Plaintiff seeks to demonstrate public benefit based on articles that discuss the Court's denial of the FBI's request for an *Open America* stay but do not discuss the documents produced following the Court's Order on that request.  By way of example, the fourth item in the "Top News" section of EPIC's website simply reports that the Court denied the FBI's request for an *Open America* stay but does not discuss the documents being released pursuant to the case, as evidenced by its title "Court Rules for EPIC, Denies FBI Request for Delay in StingRay Case." https://epic.org/foia/fbi/stingray/; *see also* Ryan Gallagher, *FBI Accused of Dragging Feet on Release of Info About 'Stingray' Surveillance Technology*, Slate Future Tense Blog, Oct. 19,

---

[3] Several other articles cited by EPIC on its website also concern information derived from other legal proceedings.  The third item listed in the "Top News" section of EPIC's website – titled "Court Permits Police Use of Phony Cell Phone Tower" – recounts an Arizona court's denial of a suppression motion in a criminal case involving the use of cell-site simulator technology.  *Id.* (discussing *United States v. Rigmaiden*, 08-cr-814 (D. Ariz. filed July 28, 2008)).  Several other articles listed in the "News Items" section of EPIC's website concern other legal cases.  *See* Ryan Gallagher, *DoJ Accused of Illegally Withholding Info on Clandestine Cellphone Surveillance Tool*, Slate Future Tense Blog, July 24, 2013 (concerning a "new [FOIA] lawsuit filed in California earlier this month") (attached as Ex. 10); and Kim Zetter, *Feds' Use of Fake Cell Tower: Did it Constitute a Search?*, Wired, Nov. 3, 2011 (concerning the *Rigmaiden* case) (attached as Ex. 11); Jennifer Valentino-Devries, *'Stingray' Phone Tracker Fuels Constitutional Clash*, Wall Street Journal, Sept. 22, 2011 (concerning the *Rigmaiden* case) (attached as Ex. 5).

2012 (discussing EPIC's efforts to "force the feds to disclose all of the non-classified documents within 60 days") (attached as Ex. 15).

EPIC's brief and website actually demonstrate how little resulted from this litigation.  In contrast to cases where courts have found that the records produced in those cases had been widely discussed in the news media, EPIC has failed to demonstrate that following the Court's Order on the *Open America* stay it made any worthwhile effort to disseminate the documents and advance the already extensive public discussion on this topic.  This stands in sharp contrast to other cases in where a public benefit was found based on the fact that the released documents initiated and contributed to debate.  For example, in *EPIC v. U.S. Department of Homeland Security,* 811 F. Supp. 2d 216 (D.D.C. 2011), EPIC sought records pertaining to whole-body imaging technology used for screening air travelers.  This Court found that the records disclosed in that case "have provided a public benefit in that they were *covered extensively in the news media and cited frequently as a news source* during the public debate surrounding the use of whole body imaging devices in airports."  *Id.* at 234 (emphasis added).  *See also EPIC v. Dep't of Homeland Security,* No. 11-2261, 2013 WL 6047561, *3-*4 (D.D.C. Nov. 15, 2013) (documents obtained were analyzed in the *Washington Post* and other news media and "heavily featured at a congressional hearing").  Here, Plaintiff cannot even come close to this level, and thus cannot demonstrate that it added "to the fund of information that citizens may use in making vital political choices."  *Cotton,* 63 F.3d at 1120.

2.      EPIC Has Not Demonstrated that the Public Benefited from Its Newsletter

While EPIC contends that it disseminated the records to approximately 8,000 recipients of its bi-weekly newsletter, (Pl.'s Mot. at 9), a single email blast on a wide-variety of topics to a general audience without any indication of subsequent publication, public debate, or activism

hardly demonstrates a benefit to the public.  Furthermore, EPIC has failed to attach any evidence of the contents of this bi-weekly newsletter to determine whether and to what extent the present litigation and the FBI releases were discussed.  For these reasons, EPIC has not provided this Court or Defendant with information sufficient to establish the public benefit from its newsletter release.

**B.     The FBI Had a Reasonable Basis for Its Action**

Under the "reasonable basis" factor, courts consider whether the action taken by the agency had a "reasonable basis" or was instead carried out "merely to avoid embarrassment or to frustrate the requester."  *Church of Scientology v. U.S.P.S.,* 700 F.2d 486, 492 n.6, 494 (9th Cir. 1983).  Because EPIC did not challenge any of the withholdings made by the FBI pursuant to exemptions, EPIC is left to argue that FBI acted unreasonably because "the FBI violated statutory deadlines by failing to make a timely determination concerning EPIC's administrative requests" and because "the Court specifically denied the agency's request for an *Open America* stay."  (Pl.'s Mot. at 11.)  However, EPIC's argument has no merit.

Even in instances where "there was undeniably delay" in the release of responsive FOIA records, courts have held that the fourth factor weighs against the award of attorney fees where "[t]he government never refused to release documents or asserted a frivolous legal defense to plaintiffs' action."  *Simon v. United States,* 587 F. Supp. 1029, 1032 (D.D.C. 1984).  "While an agency's failure to meet deadlines is not be condoned, it does not warrant an award of fees in and of itself."  *Id.*; *see also Read v. Federal Aviation Admin.*, 252 F. Supp. 2d 1108, 1112 (W.D. Wash. 2003) ("[D]elay due to bureaucratic ineptitude alone is not sufficient to weigh in favor of an award of attorneys' fees.")  Rather, the "reasonable basis" factor "is intended to weed out those cases in which the government was 'recalcitrant in its opposition to a valid claim or

otherwise engaged in obdurate behavior." *United America Financial, Inc. v. Potter,* 770 F.

Supp. 2d 252, 257 (D.D.C. 2011); *accord Tax Analysts v. DOJ,* 965 F.2d 1092, 1097 (D.C. Cir.

1992); *Simon*, 587 F. Supp. at  1032; *Ellis v. United States,* 941 F. Supp. 1068, 1080 (D. Utah

1996) (concluding that when "the government's delay in releasing the records rather than its

substantive claims of exemption" is challenged, "the reasonableness factor does not favor a fee

award so long as the government did not engage in obdurate behavior or bad faith"); *Simon*, 587

F. Supp at 1032 ("[W]ithout evidence of bad faith, the court declines to impose a fee award to

sanction sluggish agency response.").

In this case, while FBI was not able to process the request within the 20 working days

prescribed by FOIA, the FBI did not simply ignore the requests.  The FBI began to review and

process EPIC's FOIA request prior to the filing of this action.  As discussed in the First Hardy

Declaration, the FBI's initial review of the request lead it to believe that it would need to conduct

an individualized inquiry for responsive records.  (First Hardy Decl., Ex. 1, ¶ 19.)  The FBI then

considered whether it might be able to process Plaintiff's request concurrently with a very

similar request that the FBI had received in November 2011, prior to receiving EPIC's request.

(*Id.*)  The FBI was awaiting the results of an Electronic Communication sent in response to the

November 2011 request to determine it the requests could be processed concurrently when EPIC

filed the present action.  (*Id.*)

After the filing of the present action, the FBI continued to make measured progress on

Plaintiff's request without Court order.  In May 2013, the FBI sent out an individualized

Electronic Communication seeking documents responsive to Plaintiff's specific FOIA request.

(*Id.* at 20.)  The FBI received some 25,000 pages for review and processing by the end of July

2013.  (*Id.* ¶ 21.)  After a short delay due to a scheduled upgrade of the FBI's document

processing system, (*id.* ¶ 26), the FBI then began producing documents to Plaintiff on a rolling

basis beginning on October 3, 2013, (Fifth Hardy Decl., Ex. 2, ¶ 6).  Without any Court order

mandating a production schedule due to the pendency of its Motion for an *Open America* Stay,

the FBI nevertheless produced eight interim releases on a rolling basis until the Court ruled on

the *Open America* stay on March 28, 2013.  (*Id.* ¶¶ 6-13.)

        Though the Court ultimately denied the FBI's request for an *Open America* stay, the

FBI's request for such a stay hardly demonstrates bad faith.  In its Order, the Court noted that

"[t]he amount of classified material involved in EPIC's request as well as EPIC's refusal to

narrow its request as suggested by the FBI support a stay to some degree," but found that

nevertheless the "record as a whole" did not demonstrate the existence of exceptional

circumstances.  (Dkt. 19 at 12.)  Additionally, the Court recognized that the "FBI has

implemented changes to increase the efficiency of its FOIA processing system," but found that

this was offset by an increase in the size of the backlog.  (*Id.*)  While the Court then denied the

FBI's request for an *Open America* stay, it must have inherently believed there was some tenable

basis for the request as it provided the FBI with an additional four months to complete the

production of responsive documents.  (*Id.*)  In such circumstances, where the FBI did not act in

bad faith, the FBI's ultimately unsuccessful request for an *Open America* stay was nevertheless a

reasonable one with a colorable basis in the law.  Accordingly, the fourth factor regarding

entitlement to attorneys' fees weighs against the award of such fees.

## II.     EPIC'S FEE REQUEST FOR $34,152.50 IS UNREASONABLE

        Even if EPIC were entitled to some fees, the amount of fees sought by EPIC is

unreasonable. Here, the only relief that EPIC can contend it achieved is the Court's Order

denying Plaintiff's *Open America* stay.[4]  Because the FBI met that timeline and EPIC never

contested any redactions, EPIC is at most entitled to reasonable fees for the time spent prior to

the issuance of the *Open America* Order, which in this case is the time spent drafting and filing

the Complaint and in opposing the FBI's Motion for an *Open America* Stay.  Moreover, the

amount of hours billed by EPIC for the Complaint and the work performed leading up to and

following the Court's Order on the *Open America* stay is excessive or otherwise unnecessary.

Finally, EPIC incorrectly billed for the work of two attorneys who had been admitted to the bar

for less than one year at the time that they performed the work.

### A.     The Hours Spent for Drafting, Reviewing, Discussing and Filing the Complaint Are Unreasonable and Should Be Significantly Reduced

In this case, EPIC billed a total of 18.4 hours ($5,308.50) for time spent by three

attorneys drafting, reviewing, discussing and filing the Complaint: 9.4 hours by Alan Butler, 5.5

hours by Ginger McCall, and 3.5 hours by Marc Rotenberg.  (Dkt. 28-9 at 1-2.)  This amount of

time is excessive for what was a simple complaint describing the FOIA requests, listing EPIC's

correspondence with the FBI regarding the requests, and asserting boilerplate claims regarding

the FBI's untimely response.  Given EPIC's status as a sophisticated, repeat FOIA litigant with

---

[4] In its Motion, Plaintiff also claims that it "substantially prevailed" with respect to "the additional FBI disclosures on October 1, 2013" that were released in conjunction with the FBI's issuance of a draft *Vaughn* index.  (Pl.'s Mot. at 7-8.)  However, as discussed above and noted in the Hardy Declaration, the FBI's release of a few additional terms arose, not out of this litigation, but rather the *Rigmaiden* litigation in the District of Arizona.  (Fifth Hardy Declaration, Ex. 2, ¶¶ 4, 21.)  Because the FBI had completed its review and production of documents responsive to Plaintiff's FOIA request *prior to* making the determination to release additional information in the *Rigmaiden* case, the FBI had no legal obligation to provide the additional information to Plaintiff.  Nevertheless, the FBI offered the information to EPIC as a courtesy with respect to the limited sample set because the FBI was reviewing those documents as it prepared its draft *Vaughn* index.  (*Id.*)  The fact that the FBI did not release the new terms for the entirety of the 4,377 pages produced in this case, and instead only revisited certain terms with respect to *less than twelve percent* of the total number of released documents, demonstrates that Plaintiff did not substantially prevail with respect to the October 1, 2013 release.

numerous FOIA actions pending in this district currently, it reasonably could draw on that experience in drafting the sections of its Complaint dedicated to Jurisdiction, the Parties, the Counts, and the Prayer for Relief, as that language is largely boilerplate and does not need to substantially vary from case to case.  Additionally, while EPIC included thirty-one paragraphs of facts related to the specific FOIA request at issue here, this requires nothing more than a rote recitation of information already gathered in preparation of the FOIA request itself and information on the correspondence between the parties.  Given EPIC's breadth of experience in filing FOIA actions, including many against the FBI, EPIC's expenditure of time and request for fees for the preparation and filing of its Complaint was unreasonable.  *See Elec. Frontier Found. v. Office of Dir. of Nat'l Intelligence*, No. C 07-05278 2008 WL 2331959, at *5 (N.D. Cal. June 4, 2008) (finding "12.0 hours for drafting and reviewing [a FOIA] complaint" to be "unreasonable").  At most, EPIC should be entitled to 8 hours – six at Mr. Butler's rate and two at Mr. Rotenburg's – for drafting what should have been a simple and straightforward FOIA complaint of the sort EPIC has filed many times before.

**B.    The Hours Spent Preparing a Proposed Scheduling Order Are Unreasonable and Should Be Reduced**

EPIC seeks some $3,494.50 in fees for three separate attorneys to complete the initial proposed scheduling order requested by the Court, despite the fact that this order was largely boiler plate with the exception of a *one paragraph* substantive submission from Plaintiff.[5]  (Dkt. 12.)  Beginning on June 14, 2013, EPIC began to bill for three attorneys to complete 11.1 hours

---

[5] This is not the first instance of EPIC unabashedly overbilling the government.  In *Electronic Privacy Information Center v. U.S. Dept. of Homeland Security,* No. 10-1992, 2013 WL 5620891 (D.D.C. Oct. 15, 2013), Judge Royce C. Lamberth reduced the hours claimed for two conferences for which EPIC had billed for eight attorneys. *Id.* at *4.  He stressed that "the Court will pay particular close attention when many lawyers bill for a single task." *Id.* at *2.

of work in relation to the drafting and filing of a Joint Proposed Scheduling Order on June 27,

2012.  (Dkt. 28-9, entries from June 14, 2012 through June 27, 2012.)  This is an unreasonable

request given a plain review of the document at issue – the document is only three and a half

pages, one of which was entirely and solely drafted by defense counsel, and it contains

boilerplate language borrowed from EPIC's Complaint and other routine proposed scheduling

language.  (Dkt. 12.)  While EPIC included a one-paragraph statement of its position regarding

the FBI's proposed schedule for the production of documents and listed its counter proposal, it

hardly requires three attorneys some eleven hours to draft a one-page statement.  These entries

should be reduced to, at most, three hours billed at Mr. Butler's rate.

**C.      EPIC Is Not Entitled to Fees for Reviewing Documents and Other Work
         Performed After the Court's Order on the *Open America* Stay Request**

Even if EPIC were entitled to some reimbursement for reasonable time spent drafting and

filing the complaint on the theory that it obtained relief based on the Court's entry of the *Open

America* Order, EPIC is not entitled to reimbursement for its work performed reviewing

documents received pursuant to the FOIA request and for work following the FBI's production

of documents in accordance with the Court's *Open America* Order.  The provision in FOIA

authorizing an award of attorneys' fees and other litigation costs is a limited waiver of the federal

government's sovereign immunity.  *See Kennedy v. Andrus*, 459 F. Supp. 240, 242 (D.D.C.

1978).  Although "[t]he federal government may waive its sovereign immunity by statute," such

a waiver "'must be unequivocally expressed in statutory text.'"  *Webman v. Fed. Bureau of

Prisons*, 441 F.3d 1022, 1025 (D.C. Cir. 2006) (quoting *Lane v. Peña*, 518 U.S. 187, 192

(1996)).  Moreover, "[c]ourts must strictly construe any waiver of sovereign immunity, in terms

of its scope, in favor of the sovereign."  *Id.* (internal quotation marks and citations omitted).

Accordingly, "an express waiver is required before attorneys' fees can be assessed against the

federal government." *Kennedy*, 459 F. Supp. at 242; *see also N.Y.C. Apparel F.Z.E.*, 563 F.

Supp. 2d at 226-27 (construing the FOIA attorneys' fee provision narrowly because a broader

construction would impermissibly go beyond the scope of Congress's explicit waiver of

sovereign immunity).

Because FOIA only provides courts with jurisdiction to "enjoin [an] agency from

withholding agency records and to order the production of any agency records improperly

withheld," 5 U.S.C. § 552(a)(4)(B), a party may only obtain fees insofar as such fees relate to an

agency's withholding of documents. *Uhuru v. U.S. Parole Comm'n*, 734 F. Supp. 2d 8, 13

(D.D.C. 2010). EPIC's claim of eligibility for attorneys' fees here is based on its argument that

it obtained documents pursuant to this Court's Order on the *Open America* stay. (Pl.'s Mot. at

7.) Assuming *arguendo* that EPIC is correct, that does not provide a basis on which EPIC may

obtain fees for reviewing the released documents or other matters. The "catalyst theory" is not a

"poisonous tree" that continues to bear fruit in the form of attorneys' fees assessed against

federal taxpayers for the duration of litigation.

Moreover, the review of released documents is work that EPIC would have performed

irrespective of whether it had instituted litigation, and in this manner is indistinguishable from an

initial FOIA request or work at the administrative level, tasks for which FOIA does not permit

the recovery of attorneys' fees. *See CREW v. DOJ,* 825 F. Supp. 2d 226, 231 (D.D.C. 2011); *see*

*also Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984) (holding that a

party seeking attorneys' fees under FOIA "must show that the prosecution of the action could

reasonably be regarded as necessary to obtain the information . . . and that a causal nexus exists

between that action and the agency's surrender of the information"); *see also Ajluni v. FBI*, 947

F. Supp. 599, 611 (N.D.N.Y. 1996) (limiting plaintiff's award to "fees incurred up to, and

including" the point at which "the last of the . . . documents were released" in a case where the

defendant agency was granted summary judgment on its use of exemptions); *Steenland v. CIA*,

555 F. Supp. 907, 911 (W.D.N.Y. 1983) (finding that work performed after records were

released, where defendant's asserted exemptions were subsequently upheld, "would assess a

penalty against defendants which is clearly unwarranted").  This is especially true here, where

EPIC never challenged any of the redactions or received any other court-ordered relief as a result

of this review.  Indeed, under these circumstances, an award of fees would not constitute

reasonable compensation for litigation expenses, but would instead amount to "a sanction for the

[defendant's] delay in responding to [a] FOIA request, [and] the FOIA does not recognize such a

claim."  *Uhuru*, 734 F. Supp. 2d at 14.

In short, to the extent that EPIC is eligible for or entitled to any fees, it is eligible for fees

for the work performed that was necessary to obtain release of the non-exempt documents, and

nothing more.

> ### D.   The Hourly Rate Sought By EPIC for Alan Butler and Julie Horwitz Should Be Reduced

The hourly rates sought by EPIC for the work done by Alan Butler and Julie Horwitz

should be reduced.[6]   For 2012, the Laffey matrix lists the rate for attorneys with 1-3 years of

experience as $240; this rate increased to $245 in 2013.  *See* Ex. 16.  As this Court has

---

[6] Because Mr. Butler was not admitted to practice in the District of Columbia until January 11, 2013, and Ms. Horwitz still is not admitted to practice in this Court, it is questionable whether they are even entitled to attorney rates for periods when there were not admitted to this bar.  *See Dickens v. Friendship-Edison P.C.S.,*724 F. Supp. 2d 113, 119-20 (D.D.C. 2010) ("Though they were admitted to the bars of other states, neither RR nor CB were licensed to practice in the District of Columbia during the time they worked on these cases. . . . Accordingly, this Court accepts Defendant's suggestion that attorneys RR and CB are reasonably billed at the hourly rate for paralegals.") (IDEA case).  *See also  Baker v. D.C. Pub. Schs.,* 815 F. Supp. 2d 102, 116 (D.D.C. 2011) ("Attorneys who are not admitted to the D.C. Bar are not entitled to reimbursement at attorney rates. . .") (IDEA case); *but see EPIC v. Dep't of Homeland Sec.,* 2013 WL 6047561, at *6.

recognized, however, the Laffey matrix contains "no category for an attorney who has been admitted to practice law but who has less than a full year of legal experience." *EPIC v. Dep't of Homeland Security*, 2013 WL 6047561, at *6. Because there is no category for attorneys with less than one year of experience, Judge Bates recently found that attorneys with less than one year experience should be compensated at an hourly rate of $195 for 2013, splitting the difference between the $145 hourly rate for paralegal and law clerks and the $245 hourly rate for attorneys with 1 to 3 years of experience. *Id.*

Applied to this case, the rate billed by both Alan Butler and Julia Horwitz must be reduced. Alan Butler is a 2011 law school graduate, and was admitted to the bar on December 12, 2011. (Butler Decl., Ex. 3 to Pl.'s Mot., Dkt. 28-4, ¶¶ 3, 7.) Mr. Butler would not qualify for the Laffey matrix rate for attorneys with 1-3 years of experience until he had reached the one-year anniversary of his bar admission on December 12, 2012. Yet, Mr. Butler seeks to bill for some 52.2 hours of work completed prior to his one year anniversary at the rate assigned to attorneys with 1-3 years of experience. Similarly, Julia Horwitz is a 2012 law school graduate. (Horwitz Decl., Ex. 4 to Pl.'s Mot., Dkt. 28-5, ¶ 4.) Ms. Horwitz omits, however, that she was not admitted to the Maryland Bar until December 12, 2012, and thus would not qualify for the Laffey rate for those with 1-3 years of experience until December 12, 2013. (Md. State Bar Ass'n Member Directory, Julia Horwitz (attached as Ex. 17).) For Ms. Horwitz, 4.7 hours of the 11.7 hours she billed for this case were completed prior to her marking the one-year anniversary of her bar admission. Therefore, to the extent that this Court finds that EPIC is entitled to compensation for the time spent by Mr. Butler and Ms. Horwitz on this case, the hourly rate attributed to their work should be reduced to $190 and $195 as discussed above.

**E.**     **EPIC's Billing Records Contain Several Anomalies with Respect to a Joint Status Report on August 29, 2013**

EPIC's billing records contain several anomalies in relation to a Joint Status Report filed on August 27, 2013.  First, Plaintiff billed for two conferences calls with undersigned defense counsel on this date, (Dkt. 28-9 at 11-12), but there was only a single call on this date.  (Email from Alan Butler, August 27, 2013 at 5:51 pm (attaching a draft of the status report "as discussed in our call this afternoon) (attached as Ex. 18); Decl. of Kimberly Herb at ¶ 2 (stating that there was only a single call that day) (attached as Ex. 19).  Second, Plaintiff seeks reimbursement for the participation of Julia Horwitz in one of the conference calls on August 27, 2013, (Dkt. 28-9 at 11), but Plaintiff failed to indicate to opposing counsel at any time during that call that Ms. Horwitz was in attendance or otherwise participating, (Herb Decl. ¶ 3).   Third, EPIC seeks reimbursement for an internal "conference to discuss joint status report" on August 30, 2013, but the joint status report had been previously prepared and filed.  (Dkt. 23.)  To the degree that this Court believes that EPIC is entitled to fees in relation to the preparation of the joint status report filed on August 27, 2013, it should exclude $149 for the conference call and $298.5 for EPIC's internal conference on August 30, 2013 to discuss the joint status report.

**F.**     **EPIC's Recovery of Fees on Fees, if any, Should Be Adjusted Downward to the Extent Its Fees Petition Is Unsuccessful**

Finally, because most (if not all) of EPIC's fees demands are unwarranted or unsupported, the amount of "fees on fees" EPIC recovers, if any, should be reduced accordingly. *See Comm'r, I.N.S. v. Jean,* 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation."); *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affairs,* No. 96-CV-01740, 1999 WL 33740260, at *5-*6 (D.D.C. Apr. 13, 1999).  EPIC to date seeks approximately $ 8,144.50 in

connection with the settlement of its request for fees and costs and its fee petition. Accordingly, if EPIC receives an award of "fees on fees" at all, that amount should be substantially reduced to reflect any reduction in the award of fees on the merits.  Defendant, moreover, urges the Court to consider as an appropriate measure the metric adopted by Judge Hogan in *LaShawn A. v. Barry*, No. 89-1754, 1998 WL 35243112 (D.D.C. Feb. 18, 1998), which capped plaintiff's recovery for "fees on fees" at 15 percent of any recovery for litigation of the merits of the case.  *Id.* at *6 (citing *Coulter v. Tennessee*, 805 F.2d 146, 151 (6th Cir. 1986).

### III.    BECAUSE DEFENDANT SERVED AN OFFER OF JUDGMENT ON PLAINTIFF, THE COURT SHOULD DIVIDE ANY AWARD INTO FEES INCURRED UNTIL AND AFTER THAT DATE

One final important condition applies to any fees awarded to EPIC as a result of Defendant's service of an Offer of Judgment on EPIC on November 13, 2013 pursuant to Fed. R. Civ. P. 68.  (*See* Ex. 20 (redacted Offer of Judgment).)  This Offer of Judgment was Defendant's final offer in this matter and was tendered by Defendant in a good-faith attempt to settle this litigation without burdening the Court with fee litigation.  EPIC did not accept this offer within 14 days of service, choosing instead to litigate and further drive up its expenses.

Under Rule 68, if an offeree prevails but recovers less than the amount that was offered, the offeree cannot recover any costs incurred after the offer.  *See Tunison v. Cont'l Airlines Corp.*, 162 F.3d 1187, 1192-93 (D.C. Cir. 1998); *B.L. Through Lax v. District of Columbia*, 517 F. Supp. 2d 57, 60 (D.D.C. 2007); Wright & Miller, *Federal Practice & Procedure*, § 3006.  The Supreme Court has held that such "costs" include attorney's fees if the relevant fee-shifting statute defines "costs" to include attorney's fees.  *See Marek v. Chesney*, 473 U.S. 1, 9 (1985). FOIA does, in fact, include attorney's fees as part of its definition of costs.  *See* 5 U.S.C. § 552(a)(4)(E) (authorizing award of "attorney fees and other litigation costs"); *Marek*, 473 U.S. at

44 (Brennan, J., dissenting) (listing FOIA as a statute in which attorney's fees are included as costs); *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, No. 1:10cv850, ECF No. 21 (unpublished) (attached as Ex. 6) at 2-4 (holding that FOIA includes attorneys' fees as litigation costs for the purposes of Rule 68 and reducing award of plaintiff that rejected Rule 68 offer, noting that "the thrust of Rule 68" is that "a party who recovers less than it was offered must bear the expense of its erroneous choice").

For the purpose of determining whether a judgment for attorneys' fees is, or is not, more favorable than an unaccepted Offer of Judgment, the point of comparison is the court's determination of the amount of fees reasonably incurred *prior* to the Offer of Judgment. *See Marek*, 473 U.S. at 7 ("[P]ost-offer costs merely offset part of the expense of continuing the litigation . . . and should not be included in the calculus"); *Goos v. Nat'l Ass'n of Realtors*, 68 F.3d 1380, 1382 (D.C. Cir. 1995). Thus, if the Court determines that EPIC is entitled to pre-offer fees and costs that are less than the amount specified in Defendant's Offer of Judgment, EPIC may not receive any post-offer attorney's fees.

At this time, unless requested to do so by the Court, Defendant is not disclosing the amount of its Offer of Judgment out of concern that it could influence improperly the Court's fact-finding or be construed as a concession by Defendant that the amount specified in the Offer represents a reasonable award. Rather, Defendant respectfully requests that if the Court finds EPIC entitled to attorneys' fees, the Court divide such fees into two categories: those incurred until November 13, 2013, and those incurred after that date, and that the Court refrain from entering final judgment for any amount of attorneys' fees immediately. Defendant will then determine whether the Offer of Judgment is greater or less than any pre-Offer expenses awarded

to EPIC, and will expeditiously either file the Offer (and a request to deny any fees subsequent to

the Offer), or will file a Notice that the Offer did not exceed EPIC's pre-Offer expenses.

## **CONCLUSION**

For the foregoing reasons, EPIC's motion for attorneys' fees should be denied because

EPIC is not entitled to attorney fees under 5 U.S.C. § 552(a)(4)(E).  However, to the extent that

this Court finds that EPIC is entitled to fees and costs, it should receive no more than a total of

$11,180.00.  This figure represents a reasonable fee, given the limited dispute here regarding the

production schedule for documents responsive to Plaintiff's FOIA request.  This figure was

calculated to include: (1) $350 for Plaintiff's filing fee; (2) $1,140 for six hours of work at the

rate of $190 for Alan Butler's work drafting the Complaint; (3) $990 for two hours of work at the

rate of $495 for Marc Rotenberg's work drafting the Complaint; (4) $570 for three hours of work

at the rate of $190 for EPIC's work drafting the Joint Proposed Scheduling Order; (5) $6,142.50

for 31.5 hours of work at the rate of $195 for Alan Butler's work drafting Plaintiff's opposition

to the FBI's Motion for an *Open America* Stay; (6) $725 for 2.5 hours of work at the rate of $290

for Ginger McCall's work drafting Plaintiff's opposition to the FBI's Motion for an *Open

America* Stay; and (7) $1,262.50 for 2.5 hours of work at the rate of $505 for Marc Rotenberg's

work drafting Plaintiff's opposition to the FBI's Motion for an *Open America* Stay.


Dated: January 16, 2014                              Respectfully submitted,

                                                     STUART F. DELERY
                                                     Assistant Attorney General

                                                     ELIZABETH J. SHAPIRO
                                                     Deputy Branch Director

*/s/ Kimberly L. Herb*
KIMBERLY L. HERB
(Illinois Bar # 6296725)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Tel: (202) 305-8356
Fax: (202) 616-8470
kimberly.l.herb@usdoj.gov

*Counsel for Defendant*